**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————— )
                                                      )
A.M., *et al.*,                                       )
                                                      )
                        Plaintiffs,                   )
                                                      )
            v.                                        )        Civil Action No. 11-1506 (ABJ)
                                                      )
DISTRICT OF COLUMBIA, *et al.*,                       )
                                                      )
                        Defendants.                   )
———————————————————— )


<u>**MEMORANDUM OPINION**</u>

On August 18, 2011, Tracy Davenport, acting on behalf of her minor child, A.M., (together "plaintiffs"), brought this action against the District of Columbia challenging a hearing officer's determination that A.M. was not denied a free and appropriate education ("FAPE") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*. This Court referred the case to Magistrate Judge Alan Kay on September 28, 2011. Subsequently, both parties filed cross-motions for summary judgment.  The Magistrate Judge issued a Report and Recommendation on December 17, 2012, recommending that this Court deny plaintiffs' motion for summary judgment and grant defendant's cross-motion.  Plaintiffs filed timely objections to the Report.  The Court has reviewed the entire record *de novo*, including the administrative record, the transcript of the proceedings before the hearing officer, and the Hearing Officer Determination, and based on that review, it will accept the findings and recommendations of the Magistrate Judge, deny plaintiffs' motion, and grant the District's cross-motion.

## BACKGROUND

A.M. is currently a ten year-old student who resides with his mother, Tracy Davenport, in the District of Columbia.  Administrative Record [Dkt. # 15] ("AR") 8, 45.  He attended D.C. Preparatory Academy Edgewood Campus ("D.C. Prep"), a public charter school, for kindergarten and first grade.  AR 8; *see also* Tr. of A.M. Administrative Hearing [Dkt. # 15] ("Tr.") at 193:1–194:11.  While in kindergarten, A.M. was diagnosed with Mixed Receptive-Expressive Language Disorder, and he became eligible for special education and related services. AR 7, 66–68.  In September 2009, shortly after starting his first-grade year, D.C. Prep drafted an individualized education program ("IEP") providing A.M. with ten hours of special education services per week.  AR 110.  By the end of his first-grade year, A.M. had "improved in classroom participation and engagement in learning.  He ha[d] also shown growth in number sense and computation.  The Special Education teachers [at D.C. Prep] both reported significant progress.  However, his learning appeared inconsistent . . . ."  AR 110.  In the meantime, though, Ms. Davenport explored other options, and in March of 2010, she put down a deposit reserving a place for A.M. at Kingsbury Day School.  Tr. 217:20–218:21.

During an IEP meeting on the last day of school, the D.C. Prep staff gave Ms. Davenport an overview of A.M.'s progress that year and recommended revising his IEP to include fifteen hours of instruction outside the general education setting and five hours within it.  AR 79–85. The team also recommended continuing speech language services for two hours a week and occupational therapy for one and a half hours a week.  AR 85.  In response, Ms. Davenport informed the team that she had already decided to withdraw A.M. from D.C. Prep and had enrolled him at Kingsbury for the upcoming school year.  AR 85, Tr. 196:14–:19.  In August 2010, Ms. Davenport enrolled A.M. in Brookland Educational Campus at Bunker Hill – the

neighborhood school – as a non-attending student so that she could ask the D.C. public school system ("DCPS") to develop a special education program and placement for him.  AR 86, 102, Tr. 243:15–:21.

Between August 2010 and January 2011, representatives for A.M. attended and participated in four meetings with Brookland's multidisciplinary team ("MDT") to develop an IEP for A.M.  The parties also continued their discussions and work between the meetings.

- August 24, 2010 IEP Meeting:  Ms. Davenport and her attorney met with the Brookland special education team including Linda Miller (the special education coordinator), a regular education coordinator, an audiologist, a social worker, a special education teacher, a school psychologist, a speech language pathologist, and an occupational therapist.  AR 88.  During the meeting, the IEP team agreed to review the evaluations of A.M. from D.C. Prep, and Ms. Davenport gave members of the Brookland team permission to observe A.M. at Kingsbury.  AR 88–93.

- September 2010 Observations:  In September 2010, the Brookland speech language pathologist and the occupational therapist observed A.M. at Kingsbury. AR 95–99.  The Brookland school psychologist also observed A.M. at Kingsbury, reviewed A.M.'s evaluations, and interviewed his former teachers at D.C. Prep and the special education teacher at Kingsbury.  AR 102–12.

- October 13, 2010 Meeting:  Ms. Davenport, her attorney, and Marlene Gustafson (the Kingsbury Associate Head of School) met with the Brookland team including Linda Miller, a speech language pathologist, an occupational therapist, a school psychologist, and a special education teacher.  AR 116.  At the meeting, the participants reviewed their observations of A.M. at Kingsbury and decided to reconvene to determine how many hours of special education services to include in the IEP and where the IEP should be implemented after seeking input from the D.C. Prep staff.  AR 114–17.

- December 1, 2010 Meeting:  Ms. Davenport, two of her attorneys, A.M.'s godmother, and Marlene Gustafson met with the Brookland team including Linda Miller, a special education teacher, a social worker, and a speech language pathologist.  AR 121.  By this point, the IEP under consideration recommended twenty hours of specialized instruction per week.  AR 122.  The participants reviewed the proposed hours of service.  AR 121.  Additionally, Ms. Gustafson stated that more goals needed to be added to the plan and agreed to share draft goals and objectives with the Brookland team.  AR 121–22.  The Brookland team agreed to review these goals and to share a draft IEP with Ms. Davenport and her attorneys on December 15, 2010.  AR 121–22. The participants also agreed to reconvene to finalize the IEP on January 5, 2011.  AR 121–22.

3

- December 1, 2010 Letter:  Ms. Davenport's attorney wrote to Linda Miller to voice her concern that "the team has predetermined the level of service that [A.M.] requires."  AR 122.  The attorney specifically stated that at the last meeting, the IEP team proposed providing twenty hours of specialized instruction to A.M. based on discussions that occurred with D.C. Prep staff without the involvement of A.M.'s representatives.  AR 122.  The letter also stated that while Ms. Davenport is willing to consider any proposed placement for A.M., she requests that the IEP team consider placing him at Kingsbury.  AR 122.

- December 15, 2010 Draft IEP:  On December 15, 2010, Ms. Davenport's attorney sent the Kingsbury staff's suggested goals to Linda Miller, and stated her willingness to extend the IEP draft deadline to allow DCPS to incorporate these goals.  AR 134.  The Kingsbury staff suggested goals in the areas of Math, Reading Comprehension, Written Expression, Classroom Adaptation, Communication, and Expressive Speech-Language.  AR 135–43.[1]  About four hours later, Miller emailed the attorney stating that she would fax the draft IEP shortly.  AR 131.  Later that day, the attorney sent a letter to Miller expressing concern that the IEP did not include many of Kingsbury's suggested goals and again offering to give Miller more time to revise the IEP to incorporate those goals.  AR 144.  On December 17, 2010, the attorney also sent Miller additional social emotional goals to incorporate into the draft IEP.  AR 145.

- Pre-January 5, 2011 Conversation Regarding Where To Implement the IEP:  Before the final IEP meeting, Miller spoke with the placement "specialist" at Brookland about where A.M.'s IEP should be implemented.  Tr. 334:15–335:5.  The specialist reviewed the data and she and Miller decided that A.M.'s IEP could be implemented at Brookland because Brookland already had students with "life disabilities" and could provide A.M.'s academic needs and related services.  Tr. 337:13–:19, AR 167.

- January 5, 2011 Meeting:  Ms. Davenport, two of her attorneys, her educational consultant, Gustafson from Kingsbury, and a classroom teacher at Kingsbury met with the Brookland staff including Linda Miller, another special education coordinator, a special education teacher, a regular education teacher, a social worker, an occupational therapist, and a speech language pathologist.  AR 169, 171.  The Brookland team presented the IEP for A.M. and proposed implementing it at Brookland.  AR 169.  At the conclusion of the meeting, Ms. Davenport expressed her disagreement with "the proposed program and placement" because she believed that A.M. required full-time special education to be provided by

---

1   Kingsbury was not providing some of the services that they recommended that DCPS include in A.M.'s IEP.  For example, they were not providing behavioral support services as a related service to A.M. because Ms. Davenport could not afford to pay for those services.  Tr. 170:3–:21.  And at the December 1, 2010 IEP meeting, Ms. Davenport stated that Kingsbury was not then providing A.M. with speech therapy services either.  AR 120.  However, Kingsbury was prepared to offer these services if DCPS was willing to pay for them.  Tr. 170:3–171:20.

Kingsbury.  AR 169.  She also informed the group that she would be "seeking funding from DCPS for placement at Kingsbury."  AR 170; *see also* AR 187–89.

- <u>Final IEP</u>:  The final IEP included thirty minutes of occupation therapy in the general education setting and the following services outside of the general education setting: 7.5 hours per week of specialized reading instruction; 7.5 hours per week of specialized math instruction; 5 hours per week of specialized written expression instruction; 2 hours per week of speech language pathology; 120 minutes per week of behavioral support services; and 30 minutes per week of occupational therapy.  AR 179.

In February 2011, Ms. Davenport and her educational consultant visited Brookland "to see what they had to offer."  Tr. 209:19–214:2, 108:21–:22; *see also* Tr. 95:1–97:20.  While there, she asked the Brookland special education instructor to set out/detail what A.M.'s schedule would actually look like if he enrolled.  The Brookland special education instructor stated that generally it was difficult to create a schedule for a student with more than 15 hours of specialized instruction because the school had to consider other variables like recess and special subjects. Tr. 258:10–:17; *see* AR 179 (proposing that A.M. have 20 hours of specialized instruction plus additional related services).  She also stated that she could not provide a schedule for A.M. at that precise moment.  Tr. 258:10–:17.  A.M. had not yet enrolled at Brookland.  Tr. 259:7–:8.

On March 17, 2011, Davenport filed a due process complaint asserting that DCPS had denied A.M. a free and appropriate public education.  AR 218.  After a due process hearing on May 11, 2011, the hearing officer issued his determination on May 22, 2011, finding that the District did not deny A.M. a FAPE because:  (1) the January 2011 IEP contained a sufficient number of hours of specialized instruction and included appropriate goals; (2) DCPS proposed to place A.M. in a school that could implement the IEP; and (3) A.M. and his representatives had actively participated in the IEP process.  AR 23–38.  The hearing officer also concluded that DCPS did not predetermine the components of the IEP, and noted that in fact, it had adopted a number of A.M.'s team's suggestions.  AR 34–36.  The hearing officer also found DCPS's

witnesses to be more credible and persuasive because Ms. Davenport's witnesses relied on the wrong legal standards. AR 23–25. He also concluded that Ms. Davenport's own credibility was impaired because she had never intended to enroll A.M. in a D.C. public school in the first place; DCPS "could not deny FAPE to the student if the student was never going to attend one of [its] public schools." AR 25–26. Based on these findings, the hearing officer denied Ms. Davenport's request for payment for private schooling at Kingsbury. AR 38; *see also* AR 218 (detailing the relief requested by Ms. Davenport).

On August 18, 2011, Ms. Davenport filed this action on behalf of A.M. appealing the hearing officer's determination.[2] Compl. [Dkt. # 1] ¶¶ 1–2. The Court referred the case to Magistrate Judge Kay for full case management on September 28, 2011. Order Referring Case [Dkt. # 4]. Plaintiffs then filed a summary judgment motion arguing the administrative decision should be reversed because the hearing officer was impartial, "failed to complete a reasoned and substantive analysis of the evidence before him, [and] incorrectly determined that DCPS had offered A.M. an appropriate Individualized Education Program ("IEP") and placement." Pl.'s Mem. in Supp. of Mot. for Summ. J. [Dkt. # 18] at 1–2. Defendants opposed the motion, and filed their own cross-motion for summary judgment asking the Court to affirm the hearing officer's decision. Def.'s Opp. to Pl.'s Mot. for Summ. J. and Def.'s Mem. in Supp. of its Cross-Mot. for Summ. J. [Dkt. # 20] at 44.

On December 17, 2012, the Magistrate Judge issued a Report and Recommendation in which he recommended that this Court deny plaintiffs' motion and grant defendant's cross-motion. Report and Recommendations [Dkt. # 24] ("R&R") at 2. Plaintiffs filed their timely

---

2 The action was originally against both the District of Columbia and Mahaley Johnson, in her official capacity as the Acting D.C. Superintendent of Education. Compl. ¶ 6. But on September 21, 2011, plaintiffs consented to the dismissal of Ms. Johnson from the case. Minute Order (Sept. 21, 2011).

objections to the Report on December 27, 2012.   Pls.' Objections to Report and Recommendations [Dkt. # 25] ("Pls.' Obj.").

## STANDARD OF REVIEW

When a party objects to a Magistrate Judge's recommended disposition, the Court reviews *de novo* the portion of the recommendation that has been objected to.  Fed. R. Civ. P. 72(b)(3); *see, e.g.*, *Smith v. District of Columbia,* 846 F. Supp. 2d 197, 198–200 (D.D.C. 2012); *D.D. ex rel. Davis v. District of Columbia,* 470 F. Supp. 2d 1, 1–3 (D.D.C. 2007).  The Court may "accept, reject, or modify" the magistrate judge's recommendation.  Fed. R. Civ. P. 72(b)(3).

## ANALYSIS

Plaintiffs raise four objections to the Magistrate Judge's Report and Recommendations. They contend that:

1. The Magistrate Judge did not properly address "the overwhelming evidence of predetermination;"

2. The Magistrate Judge erred in accepting the hearing officer's credibility determinations;

3. The DCPS IEP was deficient; and

4. The hearing officer was biased and/or incompetent.

Pls.' Obj. 2–13.  None of these grounds compels the rejection of the Magistrate Judge's Report or the reversal of the hearing officer's determination.

## I.     The Record Reflects That Ms. Davenport Fully Participated In The IEP Process.

In their objections to the Magistrate Judge's report, plaintiffs set out the authorities that require "meaningful" participation by the parent in the decision making process. *See, e.g. Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 208 (1982) ("Congress sought to protect individual children by providing for parental involvement . . . in the formulation of the

child's individual educational program.") (citation omitted); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 858 (6th Cir. 2004), (citation omitted) ("Participation [of parents] must be more than a mere form; it must be *meaningful*.") (emphasis in original).  The District does not quarrel with this fundamental proposition, and the Report and Recommendation reflects that the Magistrate Judge assessed the record with this important legal principle in mind.  *See* R&R at 11–12.  And, as the Magistrate Judge determined, the record demonstrates a pattern of consistent and meaningful participation by Tracy Davenport, the parent of the child involved.  Not only did Ms. Davenport attend four IEP meetings, AR 88, 116, 121, 169, and make comments at those meetings, AR 88, 115, 120, 169–70, but she was accompanied by a skilled special education attorney at all of the meetings, AR 88, 116, 121, 169, 171.  On top of that, the Associate Head of the Kingsbury Day School – Marlene Gustafson, a Kingsbury classroom teacher, A.M.'s godmother, and an educational consultant all participated in one or more meetings, in person or by telephone conference.  AR 116, 121, 169, 171.  The record further reflects, as the Magistrate Judge found, that DCPS was receptive to their input and incorporated many of their recommended goals into A.M.'s IEP.  *Compare* Kingsbury Suggested Goals, AR  135–47, *with* DCPS IEP, AR 171–83 (demonstrating that the proposed IEP included goals in all the subject areas that Kingsbury suggested except classroom adaptation).

Given this evidence of active participation by a parent supported by a team of experts and advocates, and a constructive dialogue between DCPS and A.M.'s team, the record amply supports the Magistrate Judge's finding that Ms. Davenport's participation in the development of the IEP was meaningful.

Plaintiffs also advance a more specific objection, though, and they assert:

> Prior to the final IEP meeting, DCPS unilaterally determined that A.M. should attend Brookland with twenty hours of specialized instruction.  The

> decision was made without the input of A.M.'s mother; she was not
> afforded an opportunity to be part of the decision-making process about
> placement.

Pls.' Obj. at 1-2.

Plaintiffs submit that the Magistrate Judge ignored "overwhelming" and "undisputed and clear" evidence of "blatant predetermination" of both the amount of specialized instruction A.M. would receive and the particular school at which he would be placed. *Id.* at 1, 2, and 6. The District correctly observes that the particulars of plaintiffs' concerns about predetermination have been something of a moving target, and that plaintiffs tend to blur the distinctions between the development of an IEP, the determination of an educational "placement" under the IDEA, and the selection of a particular school location for the implementation of that program. Def.'s Response to Pls.' Objections to Magistrate Judge's Proposed Findings and Recommendations [Dkt. # 26] at 3–4; *see Lunceford v. District of Columbia Bd. of Educ.*, 745 F.2d 1577, 1582 (D.C. Cir. 1984) (stating that educational "placement" under the IDEA refers to the general educational program in which a child is enrolled, not to a specific location); *see also A.W. ex rel. Wilson v. Fairfax Cnty. Sch. Bd.*, 372 F.3d 674, 682 (4th Cir. 2004) (finding that under the IDEA, "'educational placement' is not the location to which the student is assigned but rather the environment in which educational services are provided"); *T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 419 (2nd Cir. 2009), *cert. denied*, 130 S. Ct. 3277 (2010) ("'Educational placement' refers to the general educational program – such as the classes, individualized attention and additional services a child will receive – rather than the 'bricks and mortar' of the specific school.").

The Court finds that the record citations submitted in support of plaintiffs' objection on these grounds, and the review of the record as a whole, do not supply grounds for rejecting the Magistrate Judge's report.

Plaintiffs base their argument largely on one portion of the testimony of Linda Miller, the D.C. Special Education Coordinator.  They insist that her acknowledgment that she discussed A.M.'s particular school assignment with a placement specialist on her own between the December and January IEP meetings was "fatal to the provision of a FAPE."  Pls.' Obj. at 3.  This does not follow from the snippet of testimony presented or from her testimony as a whole.

Plaintiffs point to Miller's testimony on page 337 of the hearing transcript about her conversation with the DCPS placement specialist.  At that point, the witness was being questioned by plaintiffs' counsel, who had also been present at the IEP meetings:

> Q [by plaintiffs' counsel]:  So you had your own conversation with her and then you shared it with your team?
>
> [Ms. Miller]:  Pretty much I had presented the information to her just to let her know that we do have a student with life disabilities and she reviewed everything just as well as, you know, her and I talking back and forward.  And a decision was, you know, pretty much made that we can do it here because we already have kids here with – you know, with life disabilities.
>
> Q:  So you and this placement person made this decision and then you reported it back to the IEP team?
>
> A:  We shared it with you in January the 5th.  You asked in the December the 15th meeting for us to have a placement and that's what I did.  I went out to do that for you.

Tr. 337:11–338:3.  But this discussion does not establish that DCPS made its "placement decision" outside of the IEP meeting and without Ms. Davenport's input.  Even looking at this portion of the testimony alone, it is clear that the witness is explaining that in the wake of questions asked by the parent's attorney at the December meeting, she consulted with her own

specialists so that she could be more specific at the next meeting about the particular school being proposed and whether A.M.'s neighborhood school, Brookland, could ultimately be the assigned location.

But if that is not clear from the cited excerpt, it becomes quite clear from a review of Miller's testimony in its entirety. On page 334, Miller discussed the December IEP meeting in response to questions from plaintiffs' counsel. She was asked if she had informed Ms. Davenport that Brookland would not be the right fit for A.M.

> A: No, that is not what I said. I said, again, I had to check with our placement person because again we were -- remember that meeting was a lot of discrepancies that were happening . . . dealing with the goals and those kinds of things. And our team needed a little bit more time to take a look at those things if you recall.

Tr. 334:15–:20. Plaintiffs' counsel then posed questions asking if Miller and the placement specialist consulted about where A.M "should be placed." Tr. 335:14–:16. The District objected to the form of the question, and the hearing officer stepped in to clarify the terminology that was being used and to verify that the witness understood it:

> MR. GERL: Well, the word placement is used in a lot of different ways, but you are talking about the location of where the IEP would be implemented, right?
>
> [Counsel for plaintiff]: Yes. Sure.
>
> MR. GERL: Okay. Do you understand that?
>
> THE WITNESS: Pretty much.

Tr. 336:7–:12. With that in mind, Miller testified that she knew at the time that there were already students with life disabilities who required 20 hours of service whose needs were being met at Brookland, but she went on to confirm the suitability of that particular school with the placement specialist. Tr. 336:14–337:19. The colloquy that plaintiffs highlight followed.

The record then reflects that counsel for the District clarified the matter further on redirect:

> Q:   Okay.  We've been using a lot of terms in this case, location, placement.  When you said that you spoke with your supervisor --
>
> A:  Yes.
>
> Q:   -- did you mean that your supervisor made the decision about the service hours on this page?
>
> A:  No.
>
> Q:  Okay.  Now when you were speaking to your supervisor, were you all just talking about the school location?
>
> A:  Pretty much the placement.
>
> Q:  Okay.
>
> A:  We were talking about the placement.
>
> Q:  And when you say placement, do you mean these hours on the page or do you mean the school, the physical school?
>
> A:  The physical school.
>
> Q:  Okay.  And did the team along with the parent come off [sic] with the service hours on page 9?
>
> A:  Okay, did the parent come up with the hours?
>
> Q:  No, let me rephrase.
>
> A:  Okay.
>
> Q:  Were these hours developed in the IEP meeting?
>
> A:  Yes.
>
> Q:  Was the parent participating in the meeting?
>
> A:  Yes.
>
> Q:  She didn't agree, but she was allowed to participate, correct?
>
> A:  Yes, she was.
>
> Q:  And she was allowed to voice her opinion along with Ms. Rosenstock [plaintiffs' counsel], Ms. Mounce [plaintiffs' educational advocate] and whoever else was there, correct?

> A:  Yes.
>
> Q:  All right.  And the same is true for setting whether the services were in or out of general education, correct?
>
> A:  Yes.

Tr. 340:17–342:9.

So the record does not support plaintiffs' contention that the DCPS Special Education Coordinator came up with A.M.'s plan in a secret meeting without input from Ms. Davenport or her team. It simply reveals that after an IEP had been presented to Ms. Davenport at the December meeting, and the goals were discussed and revised with Ms. Davenport's participation, Miller then touched base with her own placement specialist to confirm that Brookland would be able to implement the IEP and all of the hours of service it contained.  Prior to the December meeting, DCPS went to observe A.M. at Kingsbury.  It heard from Ms. Davenport and the educational advocate, and it reviewed written IEP goals proposed by Kingsbury before finalizing its own. The hearing officer and Magistrate Judge therefore correctly concluded that there was no evidence of predetermination or exclusion of Ms. Davenport from the development of A.M.'s "placement" as that term is meant in the context of the IDEA.[3]

---

3    To support their claim that the hours of service were also predetermined, plaintiffs argue that during the meeting between Miller and the placement specialist, "*which was held without Ms. Davenport or any other member of the IEP team*, a decision was made as to the amount of specialized instruction and the placement/school."  Pls.' Obj. at 3 (emphasis in original).  But the record shows that the conversation between Miller and the placement specialist focused on where to implement the IEP; the hours of service were determined at the IEP meetings that Ms. Davenport attended.  Tr. 341:2–:18.  Indeed, the twenty hours had been part of the discussion since D.C. Prep created its IEP the previous spring.  AR 79-85.  Since plaintiffs' objections do not point to any record cites for their claim that the number of hours in the IEP was predetermined, the Court maintains its finding that the Magistrate Judge properly decided that the IEP was not predetermined.

**II.      The Hearing Officer's Credibility Determinations Were Supported By The Record.**

The Court came away from its review of the record with the same impression voiced by the hearing officer:  that it was the plaintiffs, and not DCPS, who participated in the process with a preconceived notion of what the outcome should be.  *See e.g.,* Tr. 315:8–316:18 (testimony of Linda Miller that when the IEP was presented in January, Ms. Davenport did not respond with any specific objections to the proposal; instead, counsel for the plaintiffs immediately responded that they would be seeking funding from DCPS for Kingsbury on the grounds that a FAPE had been denied.  "Q: Did the parents or parent's representative say why this student needed to be removed from all interaction with non-disabled peers?  A:  The only thing that was discussed was that how he was doing at Kingsbury. That was it, you know, they presented the goals and those things from the school . . . and we pretty much were not in agreement at the table at that time."); and Tr. 319:19–320:7 (Miller never got any indication that Davenport wanted A.M. to attend any D.C. public school).

Moreover, as the Hearing Officer observed, Ms. Davenport became dissatisfied with her son's experience at the charter school he attended during the school year of 2009 to 2010.  In March of 2010, she put down a deposit at Kingsbury and signed a contract obligating her to pay that portion of the tuition not covered by financial assistance in full. Tr. 218:17–220:18. Davenport informed the charter school where A.M. was enrolled that he would be going to Kingsbury at the IEP meeting on the last day of school.  Tr. 196:11–:22.  The school had proposed a revised IEP including 20 hours of service, but Davenport testified, "I just said okay to get out of there."  Tr. 196:18–:19.  A.M. began attending Kingsbury in September of 2010, and according to Davenport, she saw a difference within two weeks of his enrollment.  Tr. 213:16–:18.  Kingsbury tuition was fully paid by January of 2011.  Tr. 222:6–:11.

At the hearing, Ms. Davenport was asked why she enrolled A.M. as a non-attending student at the public school in August.

> Q [by District's counsel]:  [W]hy didn't you just come to school and enroll your son at Brooklyn [sic]?
>
> A:  I wanted to see the program first, but I wanted – I didn't want [] to be used as a guinea pig anymore and I wanted him to get up to speed in his education. So as a mother I just put him at Kingsbury . . . .

Tr. 221:22–22:5.

Later in her testimony, Ms. Davenport expressed a blanket lack of confidence in the public school's ability to meet her son's needs:

> Q [by District's counsel]:  You said that the -- that Brooklyn [sic] Education Center could not, in your opinion, implement the IEP hours, do you remember saying that?
>
> A:  Yes.
>
> Q:  Which hours can they not implement?
>
> A:  The entire, everything, general ed, special ed.
>
> Q:  So it's your testimony that they can't implement the time in a general ed classroom?
>
> A:  Both general and special.
>
> Q:  Okay.  Why is it you feel that don't -- they can't have a general ed classroom for your son to attend?
>
> A:  My son would be lost.  I observed the students reading and holding a conversation with an adult, the teacher in the class, and my son couldn't do that.
>
> Q:  And I want to be clear on that because I think I heard that in testimony. I want to be clear because your statement was that they could not implement it.  Your testimony is that you don't think it would be an appropriate implementation, is that a fair statement, not that they just can't provide the hours?
>
> A:  You can do anything.  But I don't think it's a proper placement, yes.

Tr. 234:2–235:1.

At the conclusion of Ms. Davenport's testimony, the hearing officer asked her again why she enrolled A.M. in DCPS as a non-attending student.  She explained, "[b]ecause I was already in a contract with Kingsbury so I couldn't pull him from Kingsbury to put him in Brooklyn [sic] . . . but I had to enroll him in that in order to proceed in looking at the program.  Or see what they could provide."  Tr. 243:15–:21.  She added that it was her lawyer who explained that was the way to go about it.  Tr. 244:1–:6.

This Court did not have the benefit of observing Ms. Davenport's demeanor while she testified.  But it was not unreasonable for the hearing officer to conclude on this record that she had no intention of moving A.M. when she sat in the meetings with the school officials in the fall of 2010 and in January of 2011.

But ultimately, the question at issue in this action – whether DCPS provided A.M. with a FAPE – turns upon what the school system offered and not on the presence or absence of bias on the part of the mother.  So even if the hearing officer went too far in concluding that Ms. Davenport went into the process with her mind made up, and there was some possibility that she might enroll A.M. in public school for 2011–2012, the credibility finding was not crucial to the outcome, and it does not provide a basis for overturning the hearing officer's decision on the merits.  As support for his determination that the District's plan was adequate, the Hearing Officer pointed to a number of factors, including:  the fact that plaintiffs' witnesses were applying the wrong standard, AR 24–25; the fact that the plaintiffs had not presented evidence to establish a need to remove A.M. completely from all non-disabled peers, AR 27; and the evidence in the record that A.M. had actually made progress at his earlier public school placement, with fewer hours of service, AR 27–28.  Even if Ms. Davenport had legitimate grounds for predicting that remaining at Kingsbury might be the best fit for A.M., that

circumstance would not undermine the hearing officer's determination that District did not deny A.M. a FAPE.  Plaintiffs considered Kingsbury to be the optimal placement, and it may well have been.  But that does not obligate the District to pay for it if the placement it offered was sufficient to meet the educational needs of the student.  *See Jenkins v. Squillacote*, 935 F.2d 303, 305 (D.C. Cir. 1991) ("[I]f there is an 'appropriate' public school program available, *i.e.*, one 'reasonably calculated to enable the child to receive educational benefits,' the District need not consider private placement, even though a private school might be *more* appropriate or better able to serve the child . . . . In short, 'the inquiry as to the appropriateness of the State's program is not comparative.'") (citations omitted) (emphasis in original).

## III.    The IEP Was Appropriate.

"Implicit in the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child."  *Rowley*, 458 U.S. at 200.  To determine whether this standard has been met, the courts must inquire:

> First, has the State complied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?   If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Id.* at 206–07 (footnotes omitted).  The law provides a "basic floor of opportunity" for students, *id.* at 201, but it does not require states to provide "a potential-maximizing education," *id.* at 197 n.21; *see also Jenkins*, 935 F.2d at 305.

The January 2011 IEP met this standard.  In December 2010, the Kingsbury staff suggested goals in math, reading comprehension, written expression, classroom adaptation, communication, expressive speech-language, and social emotional skills for A.M.'s IEP.  AR

134–43.  The January 2011 IEP included goals in all of these subject areas except classroom adaptation.[4]  AR 172–83.  In fact, the IEP included some of Kingsbury's suggested goals almost verbatim.  *Compare* AR 135 *with* AR 172 (annual goal four in mathematics is almost identical to the goal suggested by Kingsbury); *and* AR 141–43 *with* AR 175–76 (annual goals four through eight for communication/speech and language are almost identical to the Kingsbury suggested goals).  Despite DCPS's willingness to incorporate many of Kingsbury's suggested goals, plaintiffs still argue that the IEP was inappropriate because it included only four of the "*sixteen* areas of need in the realm of social/emotional functioning and classroom adaptation."  Pls.' Obj. at 10 (emphasis in original).  Plaintiffs assert that without goals in classroom adaptation, A.M. "would be unable to make meaningful progress."  *Id.*

To support this assertion, plaintiffs rely on the testimony of plaintiffs' educational consultant, Ms. Mounce, and Ms. Gustafson.  For example, when asked why she felt that A.M. needed specialized instructions throughout the day, Ms. Mounce responded:  "Due to his deficits he is performing significantly below grade level, and due to the level of accommodations and modifications he needs in a classroom in order for a teacher to teach that information and then for him to learn it he needs that special ed setting."  Tr. 84:11–:17.  She also stated that

> [A.M.] needs help with the actual reading, and then he needs help with understanding what's being read.  And the teacher has to teach to the 20 students.  So the teacher is not able to constantly stop and give him redirection and give him prompting on where to write his answer or what's missing from his answer.  He can't get the amount of individualized attention that he needs to complete a task successful[ly] in the regular ed class.

Tr. at 100:2–:9.  Finally, she also took issue with the fact that although the special education staff at Brookland stated that they would develop a schedule for A.M., Tr. 110:3–:8, the parent's team

---

4        The 2011 IEP included goals in mathematics, reading, written expression, speech and language, emotional, social, and behavioral development, and motor skills/physical development. AR 172–83.

would not have an opportunity to preview A.M.'s actual schedule before A.M. enrolled in the school. Tr. 87:12–:21. Ms. Gustafson also testified that A.M. would not benefit from instruction in the general education setting. Tr. 147:20–:22. The record reflects, though, that the IEP recognized the need to provide A.M. with support outside of the general education setting. It contained: 7.5 hours per week of specialized reading instruction; 7.5 hours per week of specialized math instruction; 5 hours per week of specialized written expression instruction; 2 hours per week of speech language pathology; 120 minutes per week of behavioral support services; and 30 minutes per week of occupational therapy. AR 179.

It is telling that several of the components that plaintiffs insist were fundamental to an appropriate plan were not part of the offerings at Kingsbury, where he was, by all accounts, receiving a satisfactory education under an appropriate educational plan. Ms. Gustafson testified that the IEP Kingsbury submitted to DCPS included bells and whistles that A.M. was successfully doing without, but that the school would provide – *if* the District picked up the tab.

> Q [by counsel for the District]: -- you're saying he got an appropriate education, correct?
>
> A: Yes, I am saying that he is receiving benefit from and an appropriate education from the instructional program. However, he does need to have speech, PT, OT and counseling services.
>
> Q: Okay. I'm going to ask the question again, if I may. Is the student receiving an appropriate education at Kingsbury without receiving speech?
>
> A: He is -- yes, he is receiving an appropriate instructional --
>
> Q: Okay.
>
> A: -- program.
>
> Q: And would your answer be the same for the other related services that you said you would like to see him get, but he's not getting such as OT, PT and you said psychological services.
>
> A: Yes, and let me amend that. The IEPs -- the new language is behavioral support services, not counseling or psychological services.

Tr. 167:1–:20.  A couple of pages later, she clarified her position:

> A:  No, what I'm saying is that if -- if [A.M.] were to become a funded student, the therapeutic, not the instructional -- the social worker provides instructional services.  She runs a social skills program that is part of the instructional program.  It is not a related service.  It is part of what this classroom does just as we do reading, just as we do math, just as we do science and social studies.  This would continue even if [A.M.] were funded, because it is part of the instructional program.  If [A.M.] were funded, we would recommend that he receive behavioral support services to address some of -- in greater depth and possibly even with greater power to ameliorate some of the issues that he has around self-esteem, competency as a learner.  Some of the --
>
> Q:  Why -- why wait to see if he's funded to recommend those things?
>
> A:  My understanding is that his family cannot afford the behavioral support services as a related service.

Tr. 170:3–:21; *see also* Tr. 230:5–232:3 (testimony by Ms. Davenport that A.M. was receiving an appropriate education at Kingsbury although he was not receiving speech services, occupational therapy, or psychological services, and was not receiving any instruction from a special education teacher).  So according to Ms. Gustafson, A.M. was getting an appropriate education at Kingsbury even though he was not getting all the services he "needed."

This testimony supports the hearing officer's conclusion that plaintiffs' witnesses were improperly using a potential-maximizing standard when they rejected the DCPS IEP.  But as the Magistrate Judge stated, school districts are not required to provide "a potential-maximizing education."  *See* R&R at 14, citing *Rowley*, 458 U.S. at 201, 251; *see also Jenkins*, 935 F.2d at 305.  In their objection to the Report, plaintiffs fail to demonstrate, or even allege, that the Magistrate Judge used the incorrect legal standard.  *See* Pls.' Obj. at 10.[5]  Rather, they argue that the Magistrate Judge applied the standard incorrectly because the testimony of Ms. Mounce and Ms. Gustafson demonstrate that the goals that were included in the January 2011 IEP were not

---

5       Additionally, they do not dispute that a school system does not have to provide a schedule for a student or parent until the student beings attendance.  Pls.' Obj. at 11.

"good enough." Pls.' Obj. at 10. But based on the efforts that DCPS took to review the suggestions of Ms. Davenport and her representatives and incorporate many of the Kingsbury suggested goals into the IEP, the Court agrees with the Magistrate Judge's conclusion that the IEP conveyed sufficient educational benefit upon A.M.

Moreover, both the IDEA and the District's regulations express a preference – indeed a requirement – that the student be educated in the least restrictive environment. 20 U.S.C. § 1412(a)(5); D.C. Mun. Regs. Subt. 5-E § 3011.1 (2006); *Roark ex rel. Roark v. District of Columbia*, 460 F. Supp. 2d 32, 43 (D.D.C. 2006). During the hearing, Ms. Mounce acknowledged the importance of educating students in the least restrictive environment and testified that there was nothing in the record that demonstrated that A.M. could not be around non-disabled peers or that he required specialized instruction for subjects like art and music or while at recess and lunch. Tr. 117:9–118:9. Further, since all the students at Kingsbury have disabilities, Tr. 116:18–:20, at Kingsbury, A.M. would not have an opportunity to interact with students without disabilities even during the periods when he did not need specialized instruction. Therefore, the January 2011 IEP was also appropriate because it allowed A.M. to be educated in the least restrictive environment.

## IV. The Hearing Transcript Does Not Reveal Bias Or Incompetence On The Part Of The Hearing Officer.

A hearing officer "'enjoys a presumption of honesty and integrity, which is only rebutted by a showing of some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated.'" *Thomas v. District of Columbia*, 407 F. Supp. 2d 102, 109 (D.D.C. 2005), quoting *Harline v. DEA*, 148 F.3d 1199, 1204 (10th Cir. 1998). Plaintiffs argue that the hearing officer was biased and/or incompetent because (1) he "rushed through the hearing and refused to allow the parent to put on her full and

complete case," and (2) he fell asleep during the testimony of Ms. Gustafson.  Pls.' Obj. at 12–13.

With respect to plaintiffs' first contention, plaintiffs state that the hearing officer interrupted Ms. Mounce multiple times during her testimony and refused to allow her to testify on key issues like the inappropriateness of the goals in the IEP.  *Id.*, citing Tr. 74–75.  During the pre-hearing conference, counsel identified four questions that were at issue in this case, specifically whether DCPS denied A.M. a FAPE by:  (1) offering an IEP that did not include a sufficient number of hours of specialized instruction; (2) offering an IEP that did not include necessary goals; (3) providing a location/school that could not implement the IEP; and (4) denying the parent a meaning opportunity to participate in the IEP process by predetermining the number of hours of specialized instruction in the student's IEP.  AR 5–6.  The hearing officer properly held that Ms. Mounce's testimony about the appropriateness of the goals in the IEP was not relevant to any of these questions, including whether the IEP included the necessary goals.  Tr. 75:1–:5.  As the hearing officer stated, relevant testimony would have included information about what goals were missing from the IEP.  Tr. 75:12–:22.  In response to this decision, plaintiffs' counsel reviewed the pre-hearing notes to remind herself of what issues they had agreed to explore and then agreed to move on to identifying missing goals.  Tr. 76:1–:15.  Since plaintiffs participated in identifying the relevant issues for this case, the hearing officer did not prevent them from presenting their full case when he required them to focus their examination on the relevant subject areas.[6]

---

6    Plaintiffs also allege that not allowing Ms. Mounce to testify on the appropriateness of the goals in the IEP "ignore[s] basic IDEA law regarding the appropriateness of IEP and goals." Pls.' Obj. at 13.  But plaintiffs fail to provide any authority for this statement or point to what IDEA law they are referring to.

Secondly, plaintiffs allege that the hearing officer "fell asleep during the testimony of Ms. Gustafson." Pls.' Obj. at 13. But as the Magistrate Judge explained, the hearing transcript demonstrates that the hearing officer was actively engaged during the direct and cross-examination of Ms. Gustafson; he asked questions, made statements, provided feedback, responded to objections, and interacted with the parties. *See, e.g.,* Tr. 131:5–:14, 132:2–133:19, 138:9–139:6, 140:4–:6, 141:7–:8, 148:19–149:6, 151:5–:17, 156:21–157:3, 172:19–175:8, 186:11–:19. Plaintiffs point to no part of the transcript or the record to support their assertion that the hearing officer fell asleep during Ms. Gustafson's testimony.[7] Additionally, the Court has reviewed the hearing transcript and the hearing officer's determination, and it has not found evidence that the hearing officer asked inappropriate questions or demonstrated a lack of competence or understanding. And plaintiffs have not pointed to a section of the record that demonstrates anything to the contrary. Therefore, Court agrees with the Magistrate Judge's finding that the record does not support a finding that the hearing officer was biased or incompetent.

---

[7] Plaintiffs cite to the Declaration of Ms. McMillian to support their assertion. But that declaration was not included in the administrative record and has never been entered as part of the record. Its introduction is also in conflict with the Magistrate Judge's March 16, 2012 Order denying plaintiffs' request to expand the record with evidence about the hearing officer's behavior at the hearing. *See* Order (Mar. 16, 2012) [Dkt. # 9]; *see also* Mem. Op. (Mar. 16, 2012) [Dkt. # 10]. Moreover, even if the hearing officer did not pay full attention to Ms. Gustafson's testimony, the Court has reviewed the hearing transcript, including Ms. Gustafson's testimony, *de novo* and finds no reason to overturn the hearing officer's determination.

## CONCLUSION

For the reasons stated above, Court will accept the Magistrate Judge's December 17, 2012 Report and Recommendations, deny plaintiffs' motion, and grant the District's cross-motion.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: March 28, 2013